IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    :    CRIMINAL ACTION
                               :    NO. 09-297
                               :
      v.                    :
                               :
                               :
WILLIAM COLON               :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                  SEPTEMBER 17, 2009

Defendant moves to suppress the handgun that was recovered by police after a physical altercation with Philadelphia Police Officers on April 11, 2009.  The Defendant is charged with being a convicted felon in possession of a handgun used in interstate commerce in violation of 18 U.S.C. § 922(g).

After an evidentiary hearing, and for the reasons that follow, the motion will be denied.[1]

## I. BACKGROUND

### A. **Initial Confrontation with Police Officers**

On April 11, 2009, at approximately 9:20 p.m., Philadelphia Police Officers Ramos and Slobodrian ("the Officers"), detailed to the 25th District, were on routine patrol in a marked car and in full uniform.  As they traveled north on 5th street, the Officers saw a person, later ascertained to be

---

[1]     This memorandum constitutes the Court's findings of fact and conclusions of law.

Defendant William Colon ("the Defendant"), walking north on the east side of 5th street towards Indiana Avenue.  When the Officers saw the Defendant, there had been no reports of criminal activity in the area and they had no information about the Defendant or anyone fitting his description.

The Officers saw the Defendant look in their direction. At this point, presumably because he had spotted the police cruiser, the Defendant sped up his pace and continuously looked over his shoulder at the officers.  Officer Slobodrian testified that the Defendant appeared so preoccupied with looking behind him that he almost ran into a wall as he turned onto the 400 block of Indiana Avenue.  The Officers also observed that the Defendant was holding the right side of his pants with both hands, at the waistband, with his fists clenched.

The Officers, who are familiar with this area of North Philadelphia, have identified it as a "high-crime" area.  Neither Officer had seen the Defendant in the area before.  However, both Officers grew suspicious of the Defendant because of his evasive behavior and the way that he was holding his hands at his waist. Based on their experience and training, the Officers state that they suspected the Defendant was holding a firearm or illegal narcotics in his waistband.

After the Officers formed their suspicion, Officer Slobodrian drove the patrol car alongside the Defendant, who by

now had turned the corner and was walking east on the 400 block
of Indiana Avenue.  Officer Slobodrian asked the Defendant where
he was going.  The Defendant responded, "Don't worry about it,
I'm not doing nothing", and continued to walk along Indiana
Avenue at a brisk pace.  The Officers continued to drive
alongside the Defendant.[2]  After following him for a short time,
Officer Ramos exited the vehicle and followed the Defendant on
foot.  Meanwhile, Officer Slobodrian drove east and parked the
patrol car at the next street (the corner of Indiana Avenue and
Lawrence Street) blocking the Defendant's anticipated path.

        B. **Confrontation with Officers at the corner of Indiana
           and Lawrence**

        Officer Slobodrian exited the vehicle and proceeded
west on Indiana Avenue toward the Defendant.  At the same time,
Officer Ramos continued to follow about ten feet behind the
Defendant.  When Officer Slobodrian exited the vehicle, he said
to the Defendant, "come here for a second ... we got to find out
where you live, are you from the area".  Officer Slobodrian
testified that at this point the Defendant appeared very nervous.
Officer Slobodrian stated that the Defendant stopped "as if were
going to take off running".  Finally, Officer Slobodrian
testified that when the Defendant noticed Officer Ramos behind

---

        [2]    Indiana Avenue is a westbound one-way street.  The
patrol car turned right onto Indiana Avenue, traveling eastbound.

him, the Defendant took off running.  The Officers ordered the
Defendant to stop, but he crossed the street and continued
running east toward Lawrence Street.

### C. **Initial Use of Physical Force by Officers**

Because he suspected that the Defendant may have been
armed, Officer Ramos gave chase, caught up to the Defendant, and
used his police issued taser to stop the Defendant near the
corner of Indiana and Lawrence.  Although initially knocked to
the ground by the impact of the taser, the Defendant continued to
try to flee from the Officers.  In response, Officer Ramos
tasered the Defendant again.  Officer Slobodrian then attempted
to subdue and handcuff the Defendant.  During the struggle, the
Defendant continued to reach into his waistband area.  Then
Officer Ramos tasered the Defendant one additional time before
the Defendant ceased resistance.

### D. **Handcuffing and Frisking Mr. Colon**

When the Defendant finally placed his hands behind his
back the Officers were able to successfully handcuff him.  At the
hearing, neither Officer was able to specifically remember
whether the Defendant was handcuffed with palms out or palms in.
Both of the Officers testified that when a person is resisting
handcuffing, protocol calls for the handcuffs to be placed on the
person in any way possible.  Officer Slobodrian testified that he
remembered not putting the handcuffs on particularly tight.

4

Once the Defendant was handcuffed and lying on his stomach, the Officers conducted a preliminary pat-down.  They rolled him onto either side and patted down his pocket areas for weapons or contraband.  Then, Officer Slobodrian stood the Defendant up and walked him towards the police car, in order to conduct a full frisk.  Officer Slobodrian testified that the Defendant was hunched over towards his right side, holding his right side.  Officer Slobodrian thought Mr. Colon was holding his right side because he had sustained an injury.  While Officer Slobodrian was standing near the Defendant by the police car, Officer Ramos was attempting to remove his used taser cartridge because protocol requires that the cartridge be retained and logged as evidence.

### E. **Discovery of the Handgun and Detention of Mr. Colon**

Officer Slobodrian then saw the Defendant reach around to his right front waistband, pull out a black semi-automatic handgun, and point it at the Officers.  Officer Slobodrian yelled "Gun!" and began wrestling the Defendant for control of the weapon.  Officer Ramos then drew his service weapon, pointed it at the Defendant, and ordered him to drop the gun.  Because the Defendant and Officer Slobodrian were engaged in a physical struggle, Officer Ramos was not able to safely discharge his weapon.  Instead, Officer Ramos drew his taser and applied the taser directly to the Defendant's neck and back, "dry stunning"

the Defendant.

The taser had no immediate effect on the Defendant, however, and Officer Slobodrian was only able to disarm the Defendant after a struggle.  During the struggle, the Defendant fell into the open driver's side of the police car while he continued kicking the Officers and attempting to flee. Ultimately, the Officers were only able to subdue the Defendant at about the time other officers responded to the scene.

At the scene the police recovered a Jennings Bryco .25 caliber semi-automatic handgun with one live round in the chamber and two rounds in the magazine.  The police also recovered a cloth holster and ammunition from the Defendant's person.

## II. ANALYSIS

The Defendant argues that the Officers violated his Fourth Amendment right to be free from unreasonable searches and seizures because the Officers stopped him without reasonable suspicion and arrested him without probable cause.  (Def.'s Mot. to Suppress, doc. no. 9, at 1).  Because the Defendant claims that the gun was discovered as a result of violations of the Defendant's Constitutional rights, he argues that the gun must be suppressed under the "fruit of the poisonous tree" doctrine.

At any stage in the confrontation, for the Defendant's Fourth Amendment protections to apply, there must be a "seizure" of the Defendant's person by the Officers.  There are two general

6

circumstances in which a court may find a seizure.  The first is if a person is restricted by physical force.  The second occurs if a show of authority restrains a person's liberty.  <u>California v. Hodari D.</u>, 499 U.S. 621, 625 (1991).  If a person claims that they were seized based on a show of authority, <u>Hodari D.</u> requires that there be "submission to the assertion of authority".  <u>Id.</u> at 626.

Under a Fourth Amendment seizure analysis, the Court must undertake two levels of inquiry.  First, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000) (citing <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968)).  The reasonable suspicion required for a <u>Terry</u> stop is a less demanding standard than probable cause since it "requires a showing considerably less than preponderance of the evidence" and can "arise from information that is less reliable" than that required to establish probable cause.  <u>United States v. Valentine</u>, 232 F.3d 350, 353 (3d Cir. 2000) (internal citations omitted).  Even in situations in which the conduct justifying the initial stop is susceptible to an innocent explanation, <u>Terry</u> recognized that an individual could be detained for the purpose of resolving any ambiguity.  <u>Wardlow</u>, 528 U.S. at 125.

In the second level of inquiry, the Court must

determine when and if the Terry stop escalated to an arrest.  The police may use force "reasonably necessary to protect their personal safety and to maintain the status quo" without converting a valid Terry stop into an arrest.  United States v. Hensley, 469 U.S. 221, 235 (1985).  At times, the line between a Terry stop and an arrest is more nice than bright.

To cross the line, i.e., to effectuate an arrest, the police must have had probable cause to justify the arrest. "Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested."  United States v. Meyers, 308 F.3d 251, 266 (3d Cir. 2002) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).  The Court then must examine the totality of the circumstances leading up to the arrest and decide whether, "viewed from the standpoint of an objectively reasonable police officer, [the circumstances] amount to probable cause."  Maryland v. Pringle, 540 U.S. 366, 371 (2003)(quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).

Because the interaction between Defendant and the Officers in this case occurred in stages and under changing circumstances, the Court will analyze each stage of this interaction separately.  At each stage the Court will determine:

(1) whether there was a "seizure" which would implicate Fourth Amendment protections; (2) whether the seizure was a <u>Terry</u> stop or an arrest; and (3) whether the Officers had reasonable suspicion or probable cause, respectively, to justify the seizure.

### A. <u>Initial Confrontation with Police Officers</u>

The initial confrontation on Indiana Avenue between the Defendant and the Officers was not a seizure.  Officer Slobodrian, patrolling in a high crime area, had observed the Defendant acting suspiciously and approached the Defendant to obtain more information.  The Defendant's Constitutional rights were not implicated at this time.  "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets".  <u>United States v. Terry</u>, 392 U.S. 1, 34 (1968) (White, J., concurring).  At this point, Officers Ramos and Slobodrian were simply seeking more information.  The Defendant had every right to refuse their request, and he did just that.  Accordingly, the Defendant's Fourth Amendment rights are not at issue.

### B. Confrontation with Officers at the corner of Indiana <u>and Lawrence</u>

When Officer Slobodrian cut off the Defendant's path with a marked police car and Officer Ramos approached from behind on the 400 block of Indiana Avenue, the Defendant claims he was

seized for the first time.  He claims that the Officers did not
have a reasonable, articulable suspicion to justify this seizure.
(Def.'s Mot. to Suppress, doc. no. 9, at 2).  The Government
claims that there was no seizure of Defendant's person because
the Defendant did not submit to police authority.  (Government's
Opp. to Def.'s Mot. to Suppress, doc. no. 10, at 4).

### i. <u>Seizure Analysis</u>

The Supreme Court held in <u>Hodari D.</u> that there must be
either the application of physical force or a submission to
police authority in order for there to be a seizure.  499 U.S.
621, 626 (1991).  Since there was no application of physical
force on the Defendant, the Court must determine whether there
was a show of police authority and whether the Defendant
submitted to it.

First, the Court concludes that there was a show of
police authority.  The Officers approached the Defendant from in
front and behind and ordered him to stop.  Second, the Court
concludes that the Defendant did not submit to this show of
authority.  Third Circuit case law supports the Government's
argument that submitting to police authority requires more than a
momentary pause before disobeying police commands.

In <u>United States v. Waterman</u>, the defendant refused to
put his hands in the air when confronted by police on the front
porch of a house.  569 F.3d 144, 145 (3d Cir. 2009).  When the

police drew their weapons and again asked him to put his hands in the air, he fled into the house.  Id.  The Third Circuit reversed the trial court, holding that there was not a seizure because Waterman had failed to submit to police authority.  Id.  The Court reasoned that compliance with police orders should be encouraged as a public policy, and that a seizure "would seem to require more than a momentary pause or inaction".  Id. at 146.

In order to submit to police authority, a suspect must manifest compliance with police orders.  In United States v. Coggins, a suspect submitted to police authority when he obeyed the officer's command to sit down.  986 F.2d 651, 654 (3d Cir. 1993).  In Johnson v. Campbell, police effected a stop when they wore down an uncooperative suspect by repeatedly stating the need for compliance with their commands.  332 F.3d 199, 206 (3d Cir. 2003).  Finally, in Valentine, there was no submission to police authority when the defendant disobeyed a police order to raise his hands.  232 F.3d at 358-59.

Here, the Defendant did nothing more than pause momentarily before he fled.  He was not "worn down" by police authority nor did he obey a single police command.  On these facts, the Defendant did not submit to police authority.  Therefore, the Defendant was not seized during the confrontation with the Officers in the middle of the 400 block of Indiana Avenue.

11

### ii. <u>Reasonable Suspicion Analysis</u>

Even if the Court were to find that a seizure had occurred, the Officers had reasonable suspicion to justify a <u>Terry</u> stop.  The Third Circuit has held that police observation of one or more factors may support a finding of reasonable suspicion: (1)presence of a suspect in a high crime area; (2) a suspect's presence on a street at a late hour; (3) a suspect's nervous, evasive behavior or flight from police; and (4) a suspect's behaving in a way that "conforms to police officers' specialized knowledge of criminal activity".  <u>United States v. Brown</u>, 448 F.3d 239, 251 (3d Cir. 2006).  Furthermore, reasonable suspicion may fairly be premised on officers training and experience.  <u>United States v. Robertson</u>, 305 F.3d 164, 167-68 (3d Cir. 2002).

Three of the four factors are present here.  One, the Officers knew from their experience that the block in question was a "drug block".  The area in which they encountered the Defendant is well known to police for narcotics trafficking.  Two, when the Defendant spotted the police car, he acted nervously, looking over his shoulder continuously and almost running into a wall trying to walk away from the car.  Additionally, he gave a curt, non-responsive answer to the Officers when they inquired where he was headed.  Three, the Defendant behaved in a way that conforms with criminal activity.

The Officers both testified that, based on their training and
experience, when people reach to their waistband, walking and
grabbing at it as Defendant was, they are often carrying
contraband.[3]  Therefore, based on three out of the four Brown
factors, the Officers had a reasonable suspicion to seize the
Defendant.

### C. Initial Use of Physical Force by Officers

The first time that the Defendant was detained through
the use of force was when Officer Ramos used his taser to subdue
the Defendant and prevent him from continuing his flight (across
Indiana Avenue and towards Lawrence Street).  The Court must
determine whether this seizure was a Terry stop or an arrest, and
subsequently, whether the Officers had reasonable suspicion or
probable cause to justify the seizure.

Courts have held that blocking a suspect's path,
approaching a suspect with weapons drawn, tackling a suspect,
handcuffing a suspect and placing a suspect in a police car do
not necessarily convert a Terry stop into an arrest.[4]  In a case

---

[3]     The second factor, the time of day of the incident, is
not implicated in this analysis.  While the incident occurred at
nighttime, it was only 9:00 p.m., not a particularly late hour.

[4]     See United States v. Sharpe, 470 U.S. 675, 678 (1985)
(blocking suspect's path, approaching with guns drawn did not
convert stop into arrest); United States v. Edwards, 53 F.3d 616,
619 (3d Cir. 1995) (blocking in suspect's vehicle, approaching
suspect with barking dog and hand on gun did not convert stop
into an arrest); United States v. Garza, 10 F.3d 1241, 1246 (6th
Cir. 1993) (approaching suspect with gun drawn, handcuffing

factually similar to the instant case, <u>United States v. Bonner</u>, the Third Circuit held that a suspect fleeing a legitimate traffic stop created reasonable suspicion for a <u>Terry</u> stop.  363 F.3d 213, 218 (3d Cir. 2004).  The police tackling and handcuffing the suspect in order to search him did not raise the level of the seizure from a <u>Terry</u> stop to an arrest.  <u>Id.</u>  The primary difference in this case is that, in order to prevent the Defendant from fleeing, the Officers used a taser rather than tackling the Defendant.

The Officers use of the taser on the Defendant did not raise this confrontation to an arrest.  Officer Ramos testified that he used his taser in order to prevent the Defendant from fleeing onto a dark residential street (Lawrence Street).  Both Officers suspected the Defendant was carrying contraband and, for their own safety and the safety of others in the neighborhood, did not want to pursue the Defendant through dimly lit streets. Both Officers testified that the police issued taser delivers a five second jolt of electricity which momentarily debilitates the target.  The Defendant was tased three times, the minimum number of times it took to stop him from attempting to flee and comply with the Officers' commands to put his hands behind his back.

The Court has found, considering the four <u>Brown</u>

suspect and placing suspect in police car did not elevate the stop to an arrest).

14

factors, that the Officers had a reasonable suspicion justifying a seizure.  Under the circumstances up until this time, the Officers use of force was reasonable and it did not escalate the seizure into an arrest for which the Officers needed probable cause.

### D. __Handcuffing and Frisking Mr. Colon__

The Defendant argues that when he was handcuffed, stood up and walked back to the marked police car, the length of the detainment became indefinite and the law enforcement purposes of the <u>Terry</u> stop had been completed.  Defendant contends that this created a de facto arrest.  (Def.'s Mot. to Suppress, doc. no. 9, at 16).

The Government argues that the Officers' moving the Defendant back to the police car in handcuffs did not escalate the encounter beyond a <u>Terry</u> stop. (Government's Opp. to Def.'s Mot. to Suppress, doc. no. 10, at 12).  The Government further avers that, if there was an arrest at this point, the Officers had probable cause to arrest the Defendant, based on the Defendant's actions during the <u>Terry</u> stop. (<u>Id.</u>)

### i. __De Facto Arrest__

The Supreme Court has recognized that "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop".  <u>United States v. Sharpe</u>, 470 U.S. 675, 685 (1985).  In addition to the length

15

of the suspect's detention, the Court must also consider the law enforcement purposes to be served by the stop.  United States v. Hensley, 469 U.S. 221, 228-9 (1985).

At the point when the police lifted the Defendant up and brought him towards the car, Officers had already subjected the Defendant to a pat down and found nothing in his pockets.[5] The law enforcement purposes justifying the detainment were officer safety, the safety of the community and the investigation of a person suspected of having contraband.  While the Officers had undertaken a preliminary pat down, a more substantial frisk was needed in order to achieve all three law enforcement purposes.  This full frisk would have been completed within a matter of minutes.  At this point, the Officers had reasonable suspicion to bring the Defendant back to the police car and conduct a full frisk within the confines of a Terry stop. Therefore, the Court declines to find a de facto arrest on these facts.

## ii. **Probable Cause to Arrest Defendant**

Even assuming that a de facto arrest of the Defendant

---

[5]     At this point, the Defendant was facing a lengthy period of detainment.  At the hearing, Officer Slobodrian testified that he was planning to detain the Defendant after a full frisk to get the Defendant medical attention and to ascertain his identity.  Although the Defendant could potentially have been detained for some time, the period of actual detainment, for determining whether a de facto arrest occurred, was only a matter of minutes.  See United States v. Sharpe, 470 U.S. 675, 685-86 (1985).

had occurred at this point, the Court must then determine whether the Officers had probable cause for the arrest.  The major question is whether the Court may consider the Defendant's flight from police in determining whether there was probable cause to arrest.

The Defendant argues that he was provoked into fleeing by observing Officer Ramos reach for his taser as he approached the Defendant from behind.  (Def.'s Mot. to Suppress, doc. no. 9, at 17).  The Defendant argues that provoked flight cannot be the basis for probable cause to arrest.  (Id.)  The Defendant then concludes by stating that the information known to Officers at the time they stopped him and before he fled is insufficient to support a finding of probable cause.  (Id. at 18).

The Government argues that Defendant's actions during the Terry stop, including his flight from the Officers, created probable cause to arrest.  (Government's Opp. to Def.'s Mot. to Suppress, doc. no. 12).  Officer Ramos testified that he did not have his hand on his taser when he approached the Defendant on Indiana Avenue.  Officer Slobodrian testified that he did not remember seeing Officer Ramos's hand on his taser when he approached the Defendant.  The weight of the evidence before the Court indicates that the Defendant's flight was unprovoked, and therefore, the Court can consider the flight in determining whether there was probable cause to arrest the Defendant.

17

Examining the totality of the circumstances leading up to the arrest and "viewed from the standpoint of an objectively reasonable police officer", the Officers had probable cause to arrest the Defendant. See Maryland v. Pringle, 540 U.S. 366, 371 (2003). The Defendant was seen acting suspiciously, walking with his hands in his waistband and was walking quickly away from police. Both Officers testified that in this particular neighborhood, the Defendant's conduct was consistent with possession of illegal contraband. Additionally, the Defendant gave a non-responsive answer to the Officers when asked where he was going. Finally, when the Officers attempted to stop the Defendant, he looked startled, froze momentarily and then fled. Taking all of these factors together, a reasonable officer under the circumstances could believe that an offense had been committed by the Defendant. United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002).

## E. Discovery of the Handgun and Detention of Mr. Colon

Regardless of whether the Officers had probable cause to arrest the Defendant, or even whether they had reasonable suspicion to stop him in the first place, there was a supervening event which alters the Fourth Amendment analysis. The Officers testified that the Defendant was able to draw a gun on them while on the way back to the police car. The Defendant's new and distinct act of drawing the gun purged any taint and allowed for

18

an arrest for the new act.

The Fourth Circuit recognized as much in a factually similar case.  See United States v. Sprinkle, 106 F.3d 613, 619 (4th Cir. 1997).[6]  In Sprinkle, as an officer began to conduct a Terry frisk on a suspect, a frisk that the Fourth Circuit later concluded was unsupported by reasonable suspicion, the defendant "pushed away and began to run."  Id. at 616.  "After running about one-half block with [Officer] Riccio in pursuit, [the defendant] pulled a handgun from the front of his pants" and shortly thereafter fired a shot at the pursuing officer.  Id. The defendant was subsequently charged with possessing a firearm after conviction for a felony, in violation of 18 U.S.C. § 922(g)(1).  Id.

The Fourth Circuit held that "[i]f a suspect's response to an illegal stop 'is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime.'"  Id. at 619 (quoting United States v. Bailey, 691 F.2d 1009, 1017 (11th Cir. 1982).  The "new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest."  Id.  "A

_____

        [6]    As the Government notes in their opposition brief, other Circuits have recognized a similar rule, that the taint of any illegal act could be purged by the arrestee's intervening act.  See United States v. Nooks, 446 F.2d 1283, 1288 (5th Cir. 1971); United States v. Dawdy, 46 F. 3d 1427, 1430-31 (8th Cir. 1995); United States v. Bailey, 691 F.2d 1009 (11th Cir. 1982).

contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct."  Id. (citation and internal quotations omitted).  "Because the arrest for the new, distinct crime is lawful, evidence seized in a search incident to that lawful arrest is admissible."  Id. (citation omitted).  The reasoning of Sprinkle applies directly to the instant case.

At the suppression hearing, the Defendant argued that the testimony of Officer Slobodrian was not credible because it was "implausible" that the Defendant would have been able to remove the gun from his waistband while handcuffed.  Officer Slobodrian was the only witness who was able to testify first-hand to seeing the Defendant pull the gun from his waistband, as Officer Ramos was, at the time, attempting to detach and secure his used taser cartridge.

Officer Slobodrian, however, testified that the handcuffs were not applied tightly, and that, at the time, he was not paying attention to why the Defendant was holding his right side because Officer Slobodrian thought the Defendant was injured.  If the holster was positioned on the Defendant's right hip, as both Officers testified it was, it was entirely feasible for the Defendant to reach the gun while handcuffed.

The Court finds that Officer Slobodrian's testimony is credible.  Therefore, the Defendant pulling the handgun out of

20

his waist represented a new crime, for which the Defendant's arrest was supported by probable cause.  Officers forced the Defendant to drop the handgun during the commission of this new crime.  The gun was recovered by the Officers immediately after the altercation.  It was validly seized as an instrument of Defendant's criminal act.

**III. CONCLUSION**

For the reasons set forth above, the motion will be denied.